275 F.3d 337 (4th Cir. 2001)
 SATELLITE BROADCASTING AND COMMUNICATIONS ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA, Respondents,
ASSOCIATION OF AMERICA'S PUBLIC TELEVISION STATIONS; PUBLIC BROADCASTING SERVICE; CORPORATION FOR PUBLIC BROADCASTING; NATIONAL ASSOCIATION OF BROADCASTERS; CONSUMER FEDERATION OF AMERICA; OFFICE OF COMMUNICATION, UNITED CHURCH OF CHRIST, INCORPORATED, Intervenors.
ECHOSTAR SATELLITE CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA, Respondents,
ASSOCIATION OF AMERICA'S PUBLIC TELEVISION STATIONS; PUBLIC BROADCASTING SERVICE; CORPORATION FOR PUBLIC BROADCASTING; NATIONAL ASSOCIATION OF BROADCASTERS; CONSUMER FEDERATION OF AMERICA; OFFICE OF COMMUNICATION, UNITED CHURCH OF CHRIST, INCORPORATED, Intervenors.
NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,
PAXSON COMMUNICATIONS CORPORATION, Intervenor,
v.
FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA, Respondents,
ASSOCIATION OF AMERICA'S PUBLIC TELEVISION STATIONS; PUBLIC BROADCASTING SERVICE; CORPORATION FOR PUBLIC BROADCASTING; CONSUMER FEDERATION OF AMERICA; OFFICE OF COMMUNICATION, UNITED CHURCH OF CHRIST, INCORPORATED, Intervenors.
SATELLITE BROADCASTING AND COMMUNICATIONS ASSOCIATION; ECHOSTAR COMMUNICATIONS CORPORATION; DISH, LIMITED, d/b/a DISH Network; DIRECTV ENTERPRISES, INCORPORATED; DIRECTV OPERATIONS, INCORPORATED; DIRECTV, INCORPORATED, Plaintiffs Appellants,
and
NATIONAL ASSOCIATION OF BROADCASTERS; THE ASSOCIATION OF LOCAL TELEVISION STATIONS, INCORPORATED; THE UNIVISION NETWORK LIMITED PARTNERSHIP AND UNIVISION TELEVISION STATIONS, INCORPORATED, Intervenors/Plaintiffs,
v.
FEDERAL COMMUNICATIONS COMMISSION; WILLIAM E. KENNARD, Chairman; SUSAN NESS, Commissioner, in her official capacity; HAROLD FURCHTGOTTROTH; MICHAEL K. POWELL, Commissioner, in his official capacity; GLORIA TRISTANI, Commissioner, in her official capacity; UNITED STATES COPYRIGHT OFFICE; LIBRARY OF CONGRESS; JAMES H. BILLINGTON, Librarian of Congress; MARY PETERS, Register of Copyrights, in her official capacity; UNITED STATES OF AMERICA, Defendants Appellees,
ASSOCIATION OF AMERICA'S PUBLIC TELEVISION STATIONS; PUBLIC BROADCASTING SERVICE; CORPORATION FOR PUBLIC BROADCASTING, Intervenors Appellees,
PEGASUS COMMUNICATIONS CORPORATION; CHANNEL MASTER LLC, Parties in Interest.
NATIONAL CABLE SATELLITE CORPORATION (C-SPAN); SPACE SYSTEMS/LORAL, INCORPORATED; PAXSON COMMUNICATIONS CORPORATION; CONSUMER FEDERATION OF AMERICA; OFFICE OF COMMUNICATION, UNITED CHURCH OF CHRIST, INCORPORATED; NATIONAL ALLIANCE FOR MEDIA ARTS & CULTURE; ASSOCIATION OF INDEPENDENT VIDEO AND FILMMAKERS; VIRGINIA CITIZENS CONSUMER COUNCIL; CONEXANT SYSTEMS, INCORPORATED; BROADCOM CORPORATION, Movants.
 Nos. 01-1151, 01-1272, 01-1818, 01-1271
 UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
 Argued: September 25, 2001
Decided: December 7, 2001
Corrected January 31, 2002
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (CA-00-1571-A)[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 ARGUED: Charles Justin Cooper, COOPER, CARVIN & ROSENTHAL, P.L.L.C., Washington, D.C., for Satellite, et al. Donald Beaton Verilli, Jr., Nory Miller, JENNER & BLOCK, L.L.C., Washington, D.C., for NAB. Mark Bernard Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Louis Emmanuel Peraertz, Special Counsel, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Federal Appellees. ON BRIEF: Michael W. Kirk, Victor J. Wolski, COOPER, CARVIN & ROSENTHAL, P.L.L.C., Washington, D.C.; Brian Koukoutchos, Mandeville, Louisiana; Charles G. Cole, Pantelis Michalopoulos, Rhonda M. Rivens Bolton, STEPTOE & JOHNSON L.L.P., Washington, D.C., for Satellite, et al. Henry L. Baumann, Benjamin F.P. Ivins, NATIONAL ASSOCIATION OF BROADCASTERS, Washington, D.C.; Thomas P. Olson, WILMER, CUTLER & PICKERING, Washington, D.C., for NAB, et al. Stuart E. Schiffer, Acting Assistant Attorney General, Jacob M. Lewis, Appellate Staff, Joseph W. Lobue, Hannah Stires, Federal Programs Branch, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jane A. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Federal Appellees. Robert A. Long, Jr., Mark H. Lynch, David L. Franklin, COVINGTON & BURLING, Washington, D.C.; Marilyn Mohrman-Gillis, Vice-President, Policy and Legal Affairs, Lonna Thompson, Director of Legal Affairs, Andrew D. Cotlar, Staff Attorney, ASSOCIATION OF AMERICA'S PUBLIC TELEVISION STATIONS, Washington, D.C.; Kathleen Cox, Senior Vice President Policy, General Counsel and Corporate Secretary, Robert M. Winteringham, Senior Staff Attorney, CORPORATION FOR PUBLIC BROADCASTING, Washington, D.C.; Gregory Ferenbach, Senior Vice President and General Counsel, Paul Grego, Vice President and Deputy General Counsel, PUBLIC BROADCASTING SERVICE, Alexandria, Virginia, for Intervenors Public Television Stations, et al. Harold Feld, Andrew Jay Schwartzman, Cheryl A. Leanza, MEDIA ACCESS PROJECT, Washington, D.C., for Intervenors Consumer Federation, et al. Craig C. Reilly, RICHARDS, MCGETTIGAN, REILLY & WEST, P.C., Alexandria, Virginia, for Intervenor Paxson.
 Before WIDENER, NIEMEYER, and MICHAEL, Circuit Judges.
 MICHAEL, Circuit Judge:
 
 
 1
 Direct broadcast satellite (DBS) service has recently joined cable and broadcast television as a major force in the market for delivering television programming to consumers. In these consolidated cases, representatives of the satellite industry raise various constitutional challenges to Congress's efforts to regulate competition in that market through the Satellite Home Viewer Improvement Act of 1999 (SHVIA). Pub. L. No. 106-113, 113 Stat. 1501A-523. In addition, petitioners from the broadcast industry argue that one provision (the "a la carte rule") of the FCC's order implementing SHVIA must be struck down as an unreasonable interpretation of the statute.[1] By enacting SHVIA, Congress sought to promote competition between the satellite and cable industries by creating a statutory copyright license that allows satellite carriers to carry the signals of local broadcast television stations without obtaining authorization from the holders of copyrights in the individual programs aired by those stations. The Act also imposes a "carry one, carry all" rule, which was designed to "preserve free television for those not served by satellite or cable and to promote widespread dissemination of information from a multiplicity of sources." H.R. Conf. Rep. No. 106-464, at 101 (1999) (SHVIA Conference Report). The rule, which is scheduled to take effect on January 1, 2002, will require satellite carriers that choose to take advantage of the statutory copyright license by carrying one broadcast station in a local market to carry all requesting stations within that market. We hold, as did the district court, that the carry one, carry all rule does not violate either the First Amendment or the other constitutional provisions cited by the satellite carriers. We also hold that the FCC's a la carte rule, which allows satellite carriers to offer local broadcast stations to their subscribers either individually or as part of a single package, is not arbitrary, capricious, or contrary to law. See 5 U.S.C. S 706(2)(A).
 
 I.
 A.
 
 2
 Nearly all consumers receive their television programming through one of three delivery systems: broadcast television, cable, or satellite. Broadcast television stations transmit electromagnetic signals over the air, and these signals can be captured by any receiving television antenna within range. Twenty percent of American television households rely exclusively on broadcast stations for their television programming. Viewers pay no fee to receive broadcast signals. Instead, broadcast stations are supported by advertisers who pay for air time at rates determined by the audience sizes for particular programs. The most popular broadcast stations are affiliated with one of the four major television networks (ABC, CBS, NBC, and Fox). The major network affiliates compete for viewers and advertisers with various independent broadcasters, including independent commercial stations, noncommercial stations, and affiliates of emerging networks (UPN, WB, and PAX).[2]
 
 
 3
 The broadcasters' principal competitors in the television programming delivery market are the cable and satellite industries. Cable and satellite companies now serve around 80 percent of America's television households. Unlike broadcasters, their primary source of revenue is subscription fees. Cable television distributes its signals to subscribers over a local network of wires. It has for many years been the leading provider of television programming to American homes. Roughly 67 percent of television households currently subscribe to cable. Although cable subscribers must pay for the right to receive cable signals, they receive better picture quality and a wider variety of programming options than do television viewers who rely on antennas. Today, 84 percent of cable systems offer their subscribers at least 30 channels, including national non-broadcast channels (such as ESPN, MTV, CNN, and The Weather Channel) and regional non-broadcast channels (such as the New England Sports Channel). Cable operators also retransmit the signals of local broadcast stations to their subscribers.
 
 
 4
 Providers of DBS (direct broadcast satellite) service deliver television programming by uplinking signals to satellites orbiting in space and then beaming those signals to receiving dishes connected to subscribers' television sets. In the 1980s satellite dishes were 6 to 10 feet in diameter, and satellite carriers primarily served customers in rural areas. During the 1990s satellite carriers such as EchoStar and DirecTV developed much smaller dishes and began to compete with cable for subscribers in urban and suburban areas. Today, satellite carriers provide service in each of the nation's 210 television markets and serve about 13 percent of television households.[3]
 
 
 5
 Whereas cable systems deliver their signals to subscribers over local wire networks, satellite is primarily a national service. The satellites currently used by DBS providers occupy one of three positions in the Earth's orbit (called full CONUS slots) that allow the satellites to transmit a single beam covering the entire continental United States. The beam from a full CONUS satellite contains multiple frequencies, and compression technology enables multiple television channels to be carried on each frequency. The FCC licenses the use of 32 frequencies at each orbital slot; thus, there are 96 total frequencies that satellite carriers can use to reach satellite subscribers across the United States. Currently, 50 of these frequencies are licensed to EchoStar and 46 to DirecTV. Using their current compression ratios, EchoStar and DirecTV each have the ability to carry between 450 and 500 channels via full CONUS satellites. Every channel carried on these satellites is beamed to the homes of all subscribers; however, channels that individual subscribers do not pay to receive are blocked by the use of software in the subscriber's home satellite equipment.
 
 
 6
 Like cable, satellite service is financed by subscription fees, and it offers better picture quality and more viewing options than broadcast television. Satellite carriers can provide their customers with more national and regional non-broadcast channels than most cable systems; yet before SHVIA was passed, satellite carriers had difficulty competing with cable for urban and suburban customers. The root cause of this difficulty was plain. Cable systems, but not satellite carriers, provided their customers with access to the signals of local broadcast stations. This competitive advantage was rooted not only in technology but also in federal copyright law. Unlike satellite carriers, cable operators have never been required to obtain copyright clearances for the broadcast programming they retransmit to their subscribers. To explain the origins of cable's competitive advantage over satellite, we must briefly review the history that produced the current legal regime governing the relationships among cable, broadcast television, and satellite.
 
 
 7
 In 1965, long before cable became a major force in the television programming delivery market, the FCC imposed "must-carry" rules on cable systems requiring them to retransmit the signal of any requesting broadcast station that was "significantly viewed" in its local market. See Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434, 1438-43 (D.C. Cir. 1985) (discussing the early history of cable regulation). The FCC feared that cable might undermine free, local broadcasting unless "local broadcasters were assured access to the whole of their allocated audience." Id. at 1441. Specifically, the must-carry rules were designed to aid newer UHF stations, which lacked the signal quality enjoyed by more established VHF stations. The FCC was concerned that in the absence of carriage obligations cable systems would carry only VHF stations and that non-carried UHF stations would be placed at a competitive disadvantage in the race for advertising dollars. See id.
 
 
 8
 Copyright law had little effect on cable until Congress passed the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, which provides that owners of copyrights in audiovisual works such as television programs have the exclusive right to authorize public performances of those works. 17 U.S.C. S 106(4). Although the Copyright Act of 1909 had granted copyright holders a similar right to control public performances of copyrighted works, cable operators' secondary transmissions of broadcast programs were not regarded as additional performances of those programs under the 1909 Act and thus did not infringe upon the intellectual property rights of the program copyright holders. See Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 400-01 (1968). The 1976 Act's legislative history reveals that Congress intended to countermand the result in Fortnightly by designating cable's secondary transmissions of broadcast programs as public performances of those programs: "a cable television system is performing when it retransmits the broadcast [of a television program] to its subscribers." H.R. Rep. No. 94-1476, at 63 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5677. As a result, copyright law now generally requires parties seeking to retransmit the signal of a broadcast television station to obtain authorization from those holding copyrights in each of the programs broadcast by that station. Cable operators, however, have never been subject to this general rule. Congress found "that it would be impractical and unduly burdensome to require every cable system to negotiate with every copyright owner whose work was retransmitted by a cable system." Id. at 89, 1976 U.S.C.C.A.N. at 5704. As a result, the 1976 Copyright Act granted cable operators a statutory license that allows them to retransmit broadcast television signals without securing authorization from program copyright holders. See 17 U.S.C. S 111(c).
 
 
 9
 As cable grew in popularity, cable operators and cable programmers began to chafe at the FCC's must-carry rules. Eventually, cable interests challenged the rules as an unconstitutional burden on freedom of speech, and the rules were struck down by the D.C. Circuit in 1985. See Quincy Cable TV, 768 F.2d at 1463. The FCC moved quickly to adopt a modified set of carriage rules, but the D.C. Circuit again decided that the rules violated the First Amendment. See Century Communications Corp. v. FCC, 835 F.2d 292, 293 (D.C. Cir. 1987). After a period of several years during which cable enjoyed the benefits of a statutory copyright license without the burdens of carriage obligations, Congress reimposed must-carry rules by passing the Cable Television and Consumer Protection and Competition Act of 1992 (Cable Act). Pub. L. No. 102-385, 106 Stat. 1460. Like the FCC's original must-carry rules, the Cable Act's must-carry rules were designed to protect broadcast stations that might be refused carriage in the absence of a must-carry requirement.
 
 
 10
 The Cable Act must-carry rules were also challenged on First Amendment grounds, but were ultimately upheld by the Supreme Court in Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622 (1994) (Turner I), and Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180 (1997)(Turner II). In Turner I the Supreme Court held that the must-carry rules were content-neutral restrictions on speech, Turner I, 512 U.S. at 662, reviewable under the intermediate First Amendment scrutiny standards established by United States v. O'Brien, 391 U.S. 367 (1968). The Court further recognized that the interests served by the must-carry rules -preserving local broadcast television, promoting the "widespread dissemination of information from a multiplicity of sources," and promoting fair competition in the television programming market -were important "in the abstract." Turner I, 512 U.S. at 662-63. However, the Court remanded the case for further factual development on the question of whether these interests were genuinely advanced by the must-carry rules and whether the rules were a narrowly tailored means of promoting these interests. After the remand the Court held in Turner II that the cable must-carry rules fully satisfied the O'Brien test. As a result, cable operators today enjoy the privileges of a statutory copyright license but are also bound by carriage obligations.
 
 
 11
 As the above history indicates, the cable industry developed within a context of extensive FCC regulations, but it has been largely unaffected by copyright considerations. Before 1976, cable retransmissions of broadcast programs were not regarded as additional performances of these programs and therefore did not infringe program copyrights. Since 1976, cable has enjoyed a statutory copyright license. In contrast, the satellite industry has until recently enjoyed relative freedom from FCC oversight, but its history has been shaped by a series of changes in federal copyright law. When the 1976 Copyright Act was passed, home satellite service did not exist, and the statutory copyright license created by 17 U.S.C. S 111(c) was granted only to cable systems. Although early satellite carriers lacked the channel capacity to retransmit the signals of local broadcast stations to the local audiences of those stations (called "local-into-local" service), the carriers did have the capacity and the desire to offer their subscribers some distant network signals. In other words, they had enough capacity to carry the signals of network affiliates in a major city (usually New York) throughout the entire country, but not enough capacity to carry local network affiliates in smaller cities. It was unclear, however, whether satellite carriers' secondary transmissions of the signals of network affiliates infringed the copyrights in the various programs broadcast by those stations. Satellite carriers argued that they might be eligible to use the S 111 copyright license as "cable systems," 17 U.S.C. S 111(c), or that their secondary transmissions of broadcast signals were noninfringing under the exemption for passive carriers in 17 U.S.C. S 111(a)(3). Still, they asked Congress to resolve the uncertainties about their copyright liability by passing new legislation.
 
 
 12
 Congress responded with the Satellite Home Viewer Act of 1988. Pub. L. No. 100-667, 102 Stat. 3949. Recognizing that the high transaction costs involved in clearing the rights to network signals might impede the growth of the fledgling satellite industry, Congress gave carriers a limited copyright license to retransmit the signals of distant network broadcast stations to unserved households that were unable to receive an adequate overthe-air signal through a conventional rooftop antenna. 17 U.S.C. S 119(a)(2)(B) (1994), amended by S 119(a)(2)(B) (Supp. V 1999). "Unserved households" were defined in part as those located outside a station's "Grade B contour," as defined by FCC regulations. Id. S 119(d)(10) (1994), amended by S 119(d)(10) (Supp. V 1999). Congress limited the copyright license to retransmissions to unserved households in order to respect the terms of networkaffiliate contracts, which grant local affiliates the exclusive right to broadcast their networks' programming in their local markets. Congress reasoned that local affiliates would lose the benefits of their bargained-for exclusivity rights if satellite carriers were allowed to import distant network signals into the affiliates' local markets. The limited license created by the 1988 Act spurred the growth of satellite carriers and expanded the viewing options of unserved households, though it did little to help satellite effectively compete with cable in urban and suburban areas where viewers could already receive high quality broadcast signals.
 
 
 13
 In the late 1990s two problems led Congress to revisit its work in the Satellite Home Viewer Act of 1988. First, cable continued to enjoy a virtual monopoly in subscription television services in metropolitan areas, and as a result cable subscribers were paying too much for those services. See S. Rep. No. 106-51, at 1-2 (1999). Second, the 1988 Act failed to deal adequately with the problems of satellite subscribers who lived within the Grade B contours of network television stations. Although these subscribers were ineligible to receive distant network signals under the 1988 Act's limited copyright licence, many of them were unable to receive satisfactory over-the-air signals from their local network affiliates and thus remained without any meaningful access to network programming. See id. at 3-6. In addition, administrative difficulties in deciding which households were genuinely unserved led to increasingly bitter disputes between satellite carriers and broadcasters, leaving bewildered, angry consumers stuck in the middle. See, e.g., ABC, Inc. v. Primetime 24, 17 F.Supp.2d 478 (M.D.N.C. 1998), aff'd, 184 F.3d 348 (4th Cir. 1999).
 
 
 14
 Progress in satellite technology seemed to hold out a solution to both of these problems. Satellite carriers had developed the channel capacity to offer local-into-local service to their subscribers in some markets. Congress recognized that satellite carriers that could offer viewers access to their local broadcast stations could compete effectively with cable and drive down the price of subscription television services. See H.R. Rep. No. 106-79, pt. 1, at 14 (1999). In addition, Congress understood that the difficulties in deciding which households were sufficiently unserved to receive distant network signals would be irrelevant if satellite subscribers could watch their local network affiliates. See id.
 
 
 15
 In 1997 and 1998 Congress conducted extensive hearings on the possibility of extending the satellite carriers' statutory copyright license to include local-into-local retransmissions. Representatives from the various industries had ample opportunities to state their views. Satellite industry representatives argued that without a statutory copyright license, the high transaction costs of obtaining the rights to retransmit broadcast programs would effectively prevent satellite carriers from offering localinto-local service. The satellite representatives further explained that their inability to carry local broadcast stations placed them at a competitive disadvantage to cable because viewers want to be able to receive all of the televisions channels they watch from a single source: "most people who walk into a satellite dealer's showroom turn around and walk out because they can't get their local TV channels through DBS." Reauthorization of the Satellite Home Viewer Act: Hearing Before the Subcommittee on Telecommunications, Trade, and Consumer Protection of the House Committee on Commerce, 106th Cong. 73 (1999) (1999 House Hearing) (statement of David Moskowitz, an EchoStar executive). The cable representatives stressed the need for regulatory parity, arguing that if satellite carriers were granted a statutory license comparable to that enjoyed by cable, they should also be subject to the must-carry rules and other regulatory constraints imposed on cable. See The Copyright Office Report on Compulsory Licensing of Broadcast Signals: Hearing Before the Senate Committee on the Judiciary, 105th Cong. 50 (1997) (statement of Decker Anstrom, President, National Cable Television Association). Finally, representatives of the broadcast industry emphasized that mandatory carriage rules were needed to ensure that satellite local-intolocal service would not undermine Congress's interest in preserving a vibrant system of free, local broadcast television. They explained that without carriage rules satellite carriers would choose to retransmit only the signals of major network affiliates in most markets and that competing stations in those markets would suffer from the loss of access to a significant (and growing) part of their potential audiences:
 
 
 16
 No rational doubt may exist that a local station denied access to a portion of its inmarket audience is injured. Lack of carriage reduces potential audience and, therefore, actual audience. Reduced audiences translate to reduced revenue. Even where revenue reductions are less than fatal, they still affect a station's ability to provide the best practicable service to the public. At best, a local station which a satellite carrier refuses to carry would be placed at a demonstrable disadvantage vis-a-vis competing broadcast television stations which are carried.
 
 
 17
 Copyright Licensing Regimes Covering Retransmission of Broadcast Signals (Part II): Hearing Before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 105th Cong. 68 n.38 (1998) (1998 House Hearing) (statement of James J. Popham, Vice President and General Counsel, Association of Local Television Stations).
 
 
 18
 Congress sought to balance all of these concerns when it enacted SHVIA on November 29, 1999. The Conference Report explained that the legislation was designed to promote competition between satellite and cable while "preserv[ing] free television for those not served by satellite or cable systems." SHVIA Conf. Rep. at 101. Two interrelated provisions form the heart of SHVIA. The first provision, codified at 17 U.S.C. S 122, amended the Copyright Act to create a statutory copyright license for satellite carriers similar to that enjoyed by cable operators. The license enables satellite carriers to make secondary transmissions of a broadcast station's signal into that station's local market without obtaining the authorization of those holding copyrights in the individual programs broadcast by that station. 17 U.S.C. S 122(a). Satellite carriers that make use of this license pay no royalties to program copyright holders. The second provision, codified at 47 U.S.C. S 338, amended the Communications Act of 1934 by creating mandatory carriage rules, including the carry one, carry all rule that is the focus of this litigation. 47 U.S.C. S 338(a)(1).
 
 
 19
 Since SHVIA's passage in late 1999 satellite carriers have enjoyed the benefits of the S 122 license without the burdens of the carry one, carry all rule. In order to phase in satellite carriage obligations, Congress decided that the rule would not become effective until January 1, 2002. Id. S 338(a)(3). As of that date the rule will require all satellite carriers who use the S 122 license to make local-into-local retransmissions in a local broadcast market to "carry upon request the signals of all television broadcast stations located within that local market." Id. S 338 (a)(1). In other words, the voluntary decision to carry one local station in a market under the statutory copyright license will trigger an obligation to carry all the requesting stations in that market.[4]
 
 
 20
 Like the cable must-carry rules, SHVIA's carry one, carry all rule was designed to preserve a rich mix of broadcast outlets for consumers who do not (or cannot) pay for subscription television services. SHVIA adopts much of the machinery of the cable rules. For example, broadcast stations may seek carriage from satellite carriers under either S 338's mandatory carriage requirements, 47 U.S.C. 325(b)(1)(C), or under the Act's retransmission consent provision, 47 U.S.C. 325(b)(1)(A), which allows broadcast stations to receive compensation from satellite carriers in exchange for permission to retransmit the broadcast stations' signals. In allowing broadcasters to choose between retransmission consent and mandatory carriage, both SHVIA's carry one, carry all rule and the cable must-carry rules recognize the practical realities of the television marketplace. Major network affiliates have bargaining power and will be carried voluntarily in most instances, so they will normally elect to proceed under the retransmission consent provision. See Turner II, 520 U.S. at 191 (explaining that the Cable Act's retransmission consent provision reflects the "popularity and strength of some broadcasters"). In contrast, independent stations (affiliates of emerging networks, independent commercial stations, and noncommercial stations) may need the protection of must-carry rules and will normally elect mandatory carriage.
 
 
 21
 The primary difference between S 338 and the cable must-carry rules is that S 338's obligations are conditioned upon the satellite carrier's voluntary choice to make use of the S 122 license in a particular television market, but the cable must-carry rules are mandatory in all markets. This difference reflects the technological dissimilarities between cable and satellite. Cable systems are local, and nearly all have enough channel capacity to carry all the broadcast stations in their local market and still provide an attractive mix of national and regional non-broadcast programming. The satellite carriers, in contrast, currently beam the same 450 to 500 channels throughout the continental United States and thus could not comply with a rule requiring them to retransmit the signals of each of the country's roughly 1,600 local broadcast stations. See 1999 House Hearing at 95 (statement of David Moskowitz). While Congress recognized that satellite technology continues to improve and that eventually an unconditional must-carry rule might be possible, it still had to decide how to structure the satellite copyright license in the interim.[5]
 
 
 22
 Although minor variations were possible, Congress had two basic options. It could have decided to give satellite carriers a station-by-station copyright license that could be used free of carriage obligations. Under such a license, satellite carriers could "cherry pick" the stations they wanted in each local market. Congress predicted that in practical terms a station-by-station license would result in satellite carriers using their available local-into-local capacity to carry only the major network affiliates in as many markets as possible, beginning with the largest markets and working toward the smaller ones. The other choice was to impose the carry one, carry all rule in order to create a market-by-market copyright license. This kind of license forces satellite carriers to expand their local-into-local service one market at a time, beginning with the carriage of all requesting local stations in the largest markets and expanding from there. In sum, Congress either could have allowed satellite carriers to cherry pick by retransmitting some stations (the major network affiliates) in many markets, or it could have allowed satellite carriers to retransmit all of the stations in some markets. While satellite carriers would have preferred (and now argue for) the first result, Congress chose the second because it feared that cherry picking of major network affiliates within local markets would make it more difficult for non-carried stations in those markets to reach their audiences:
 
 
 23
 Although the conferees expect that subscribers who receive no broadcast signals at all from their satellite service may install antennas or subscribe to cable service in addition to satellite service, the Conference Committee is less sanguine that subscribers who receive network signals and hundreds of other programming choices from their satellite carrier will undertake such trouble and expense to obtain over-the-air signals from independent broadcast stations.
 
 
 24
 SHVIA Conf. Rep. at 102. Non-carried stations in cherry-picked markets would "face the same loss of viewership Congress previously found with respect to cable noncarriage." Id. at 101. Congress therefore concluded that the carry one, carry all rule would protect the ability of all local broadcasters to reach their audiences and thereby "preserve free television for those not served by satellite or cable systems and . . . promote widespread dissemination of information from a multiplicity of sources." Id.
 
 B.
 
 25
 As directed by Congress, see 47 U.S.C. 338(g), the FCC issued a report and order implementing S 338's carriage requirements on November 29, 2000. In the Matter of: Implementation of the Satellite Home Viewer Improvement Act of 1999: Broadcast Signal Carriage Issues, Retransmission Consent Issues, CS Docket Nos. 00-96 and 99-363 (2000) (SHVIA Order). The only aspect of the SHVIA Order at issue here is the a la carte rule adopted in paragraph 99 of the order. The FCC concluded in that paragraph that S 338(d) does not require satellite carriers to sell all local television stations in a given market as one package. Instead, the Commission ruled that carriers could offer local stations "as a package or a la carte, at comparable rates." SHVIA Order at P 99. This language would arguably permit satellite carriers to offer their subscribers a package including only the major network affiliates while offering independent broadcast stations only on an a la carte basis. However, in a subsequent order issued while these cases were under consideration, the FCC clarified its a la carte rule by stating that satellite carriers may not offer their subscribers a package including some subset of the local stations in a market (for example, the major network affiliates) while offering other local stations on an individual basis. See In the Matter of: Implementation of the Satellite Home Viewer Improvement Act of 1999: Broadcast Signal Carriage Issues, Order on Reconsideration, CS Docket No. 00-96, at P 48 (2001) (Reconsideration Order). In other words, the Commission has now ruled that satellite carriers offering local-into-local service may offer their subscribers only two options: subscribers may buy the local stations of their choice a la carte at comparable prices, or they may buy a package of all the local stations for a price less than or equal to the cost of subscribing to all the stations individually (for example, 12 stations at one dollar each or all 12 for $12 or less). See id.
 
 C.
 
 26
 The present SHVIA litigation began on September 20, 2000, when SBCA, DirecTV, EchoStar, and DISH Network filed a complaint in the United States District Court for the Eastern District of Virginia alleging that SHVIA's carry one, carry all rule, 47 U.S.C. 338(a)(1), exceeds Congress's power under the Copyright Clause and violates the First Amendment and the Due Process and Takings Clauses of the Fifth Amendment. NAB and PBS intervened on the side of the FCC in order to defend the statute. The satellite carriers moved for summary judgment, but the FCC and its supporting intervenors filed Rule 56(f) motions requesting discovery in order to respond to the satellite carriers' motion. The district court granted their motions, and discovery began. The FCC and its supporting intervenors then filed a Rule 12(b)(6) motion to dismiss and (ultimately) a cross-motion for summary judgment. After the parties had conducted extensive discovery in support of their summary judgment motions, the district court granted the FCC and its intervenors' motion to dismiss on June 19, 2001. See Satellite Broad. & Communications Ass'n v. FCC, 146 F.Supp.2d 803, 809 (E.D. Va. 2001). The district court treated the carry one, carry all rule as a content-neutral regulation of the satellite carriers' speech and upheld the rule under intermediate First Amendment scrutiny. In addition, the court rejected the satellite carriers' arguments alleging violations of the Copyright Clause and the Fifth Amendment. The satellite carriers appealed. That appeal has been consolidated with three petitions for review of the FCC's SHVIA Order. SBCA filed a petition for review of the SHVIA Order in this circuit, and EchoStar filed a similar petition in the Tenth Circuit. Both petitions advanced constitutional challenges to SHVIA similar to those advanced by the satellite carriers in the Eastern District of Virginia. NAB filed a petition for review in the D.C. Circuit challenging the FCC's a la carte rule as arbitrary, capricious, and not in accordance with law. See 5 U.S.C. S 706(2)(A). Paxson Communications intervened in this last petition on the side of NAB. The three petitions for review were consolidated and assigned to this circuit pursuant to 28 U.S.C. S 2112(a)(3).
 
 II.
 A.
 
 27
 The parties devote the lion's share of their attention to the satellite carriers' First Amendment challenge to the carry one, carry all rule enacted in 47 U.S.C. S 338. Satellite carriers, like cable operators, function primarily as conduits for the speech of others. They transmit programming from a variety of sources (national and regional non-broadcast channels, superstations, and local broadcast stations) to their subscribers "on a continuous and unedited basis." Turner I, 512 U.S. at 629. Yet both satellite carriers and cable operators engage in speech protected by the First Amendment when they exercise editorial discretion over the menu of channels they offer to their subscribers. See id. at 63637, 114 S. Ct. 2445. Insofar as the carry one, carry all rule seeks to influence the exercise of that discretion, it is open to challenge under the First Amendment.
 
 
 28
 It is important to be clear at the outset, however, that some of the speech interests present in the Turner cases are absent here. The cable must-carry rules burdened the speech of cable programmers who had to be dropped from some cable systems in order to make room for local broadcast stations. See id. at 675, 114 S. Ct. 2445 (O'Connor, J., dissenting). To the extent the First Amendment guarantees viewers and listeners the right to receive information, see Bd. of Educ. Island Trees Union Free School Dist. v. Pico, 457 U.S. 853, 867 (1982) (plurality opinion); Red Lion Broad. Co. v. FCC, 395 U.S. 367, 390 (1969), that right was also burdened by the cable must-carry rules because the voices of dropped cable programmers were effectively lost to entire communities. Here, however, the satellite carriers do not claim that the carry one, carry all rule will force them to drop national or regional nonbroadcast programmers in order to carry more local broadcasters. They claim only that they will have to carry independent broadcast stations in larger markets at the expense of major network affiliates in smaller markets. See Brief for Petitioners SBCA and EchoStar at 26-27, 35 n.13. While those major network affiliates would no doubt prefer to be carried on satellite services, the carry one, carry all rule does not deprive those affiliates of the ability to reach their audiences. In fact, they will be in exactly the same position under the carry one, carry all rule that they would have occupied if SHVIA had never been passed. Nor will any voices be completely lost to communities as a result of the carry one, carry all rule. The rule's only negative effect on viewers will be that the major network affiliates in some markets will be available to local viewers through only two mediums (broadcast and cable) rather than three. In sum, the carry one, carry all rule burdens speech only to the extent that it affects satellite carriers' decisions about how to allocate their capacity for offering local-into-local service by inducing them to carry a different set of local broadcasters than the carriers would have preferred.
 
 
 29
 In considering the satellite carriers' First Amendment challenge, our first task is to determine the appropriate standard of review. Turner I provides the starting point. In that case the Supreme Court held that the cable must-carry rules were contentneutral restrictions on speech and were therefore not subject to strict scrutiny. See Turner I, 512 U.S. at 662. Here, the satellite carriers repeat many of the same arguments for strict scrutiny that were examined and rejected in Turner I. Although the satellite carriers labor mightily to distinguish that case, their effort ultimately fails.
 
 
 30
 The Supreme Court has said that the "'principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" Id. at 642, 114 S. Ct. 2445 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). This inquiry involves two steps. "First, we must examine the plain terms of the regulation to see whether, on its face, the regulation confers benefits or imposes burdens based upon the content of the speech it regulates." Chesapeake and Potomac Tel. Co. of Va. v. United States, 42 F.3d 181, 193 (4th Cir. 1994), vacated on other grounds, 516 U.S. 415 (1996). If it does not, we then ask whether the regulation's "'manifest purpose is to regulate speech because of the message it conveys.'" Id. (quoting Turner I, 512 U.S. at 645).
 
 The text of S 338(a)(1) provides:
 
 31
 [E]ach satellite carrier providing, under section 122 of Title 17, secondary transmissions to subscribers located within the local market of a television broadcast station of a primary transmission made by that station shall carry upon request the signals of all television broadcast stations located within that local market.
 
 
 32
 47 U.S.C. S 338(a)(1). On its face, the rule confers benefits on a content-neutral basis because satellite carriers must carry all requesting local broadcast stations regardless of the content of their programming. Cf. Turner I, 512 U.S. at 645 ("The [must-carry] rules benefit all full power broadcasters who request carriage -be they commercial or noncommercial, independent or network affiliated, English or Spanish language, religious or secular."). The satellite carriers argue, however, that the carry one, carry all rule is content-based on its face because its burdens are triggered by a satellite carrier's decision to transmit certain content, namely, the signal of a local television station.
 
 
 33
 We disagree. SHVIA's carriage obligations are not triggered simply by the decision to carry a local broadcast station in a given market. Instead, they are triggered by the decision to carry that station by making use of the S 122 license. A satellite carrier that privately negotiates the required copyright clearances can retransmit the signal of a local broadcast station without incurring any carriage obligations, but a carrier that retransmits the same signal by means of the statutory copyright license must comply with the carry one, carry all rule. Thus, the burdens of the rule do not depend on a satellite carrier's choice of content, but on its decision to transmit that content by using one set of economic arrangements rather than another. Accordingly, we hold that the carry one, carry all rule is content neutral on its face.
 
 
 34
 Next, we must decide whether the carry one, carry all rule is content-based in its purpose. The satellite carriers claim that the rule has a content-based purpose because it seeks to promote the survival of independent broadcast stations, including affiliates of emerging networks, commercial independent stations, and public broadcasting stations. In support of this claim they cite language from the Conference Report indicating that Congress was concerned that satellite carriers would choose to carry only affiliates of the major networks and that other local broadcasters would be cut off from portions of their potential viewing audiences. See SHVIA Conf. Rep. at 102. In addition, the satellite carriers rely on legislative history suggesting that Congress sought to protect local broadcast stations because those stations provide valuable news and public affairs programming to their communities. See id. at 92.
 
 
 35
 Again, we conclude that these points do not distinguish the present case from Turner I. Both Congress and the Supreme Court understood perfectly well that the cable must-carry rules primarily benefitted independent broadcast stations. See Turner I, 512 U.S. at 672-73 (Stevens, J., concurring in part and concurring in the judgment); Turner II, 520 U.S. at 191-92. Similarly, the statutory findings included in the Cable Act described broadcast television as "an important source of local news and public affairs programming, and other local broadcast services critical to an informed electorate," Cable Act S 2(a)(11), 106 Stat. at 1461, and stated that noncommercial television "provides educational and informational programming to the Nation's citizens," id. S 2(a)(8)(A), 106 Stat. at 1461. Nevertheless, the Court determined that neither must-carry's benefits to independent broadcast stations nor Congress's recognition of the distinctive value of local programming revealed a content-based purpose. Instead, the Court concluded, "Congress' overriding objective in enacting must-carry was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free television programming for the 40 percent of Americans without cable." Turner I, 512 U.S. at 646. According to the Court, Congress's findings did not show a content-based preference for broadcast television over cable television; they merely indicated that local broadcast television was intrinsically valuable and therefore worth preserving. Id. at 648, 114 S. Ct. 2445. In sum, Turner I held that the cable must-carry rules were content neutral in purpose even though the rules were meant to protect independent broadcast stations and even though Congress recognized that those stations provided valuable local programming. Here, the satellite carriers do no more than point to legislative history indicating that Congress had the same purpose in enacting SHVIA and that Congress continued to appreciate the distinctive value of local broadcast programming. This is not enough to establish that SHVIA has a content-based purpose.
 
 
 36
 We conclude, then, that the carry one, carry all rule should not be subject to strict scrutiny. At most, it is a content-neutral measure that imposes incidental burdens on speech and is therefore subject to intermediate First Amendment scrutiny under United States v. O'Brien, 391 U.S. 367 (1968). Because, as we explain below, the carry one, carry all rule passes constitutional muster under O'Brien, we need not address the FCC and its intervenors' argument that the rule should be evaluated under a more lenient standard.[6]
 
 B.
 
 37
 O'Brien directs us to uphold a content-neutral regulation of speech if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377. Deciding whether an interest is important or substantial and whether that interest is unrelated to the suppression of free expression is usually simple enough, but this is only the beginning of the inquiry. As the Turner cases explain, the O'Brien standard gets its bite from a two-part analysis. First, we must determine whether the regulation materially advances an important or substantial interest by redressing past harms or preventing future ones. These harms must be "real, not merely conjectural," and the regulation must "alleviate these harms in a direct and material way." Turner I, 512 U.S. at 664. If a regulation places even incidental burdens on speech without yielding some genuine benefit, it must be struck down. In making these evaluations, we must "accord substantial deference to the predictive judgments of Congress." Id. at 666, 114 S. Ct. 2445. Our "sole obligation is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." Turner II, 520 U.S. at 195 (internal quotation marks and citation omitted). If the regulation materially advances some important or substantial interest, we then proceed to the second part of the O'Brien analysis and ask whether the regulation is narrowly tailored to serve that interest. The O'Brien narrow tailoring requirement is less rigorous than that applied under strict scrutiny. The requirement is met "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799 (internal quotation marks and citation omitted). In other words, the regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." Id.
 
 
 38
 In sum, the carry one, carry all rule satisfies the O'Brien standard if the rule materially advances at least one substantial government interest in a narrowly tailored manner. The satellite carriers claim that the rule is simply a way to promote the interests of some speakers (independent broadcasters in large markets) at the expense of others (major network affiliates in small and medium-sized markets). Predictably, they contend that this interest is not even legitimate, let alone substantial or important. We agree that the carry one, carry all rule is meant to preserve the ability of independent broadcasters to reach their local audiences, but Congress did not view that goal as an end in itself. Instead, Congress recognized that protecting independent broadcasters from the harmful effects of satellite cherry picking would further two substantial government interests. The first is the government's interest in preserving a multiplicity of local broadcast outlets for over-the-air viewers, those who do not subscribe to satellite or cable service. The second is the government's interest in preventing its grant of a statutory copyright license to satellite carriers from undermining competition in local markets for broadcast television advertising. Though these two interests are closely related because both would be threatened in the same manner without the carry one, carry all rule, they are distinct because the first involves harms to overthe-air viewers while the second involves harms to local advertisers and to independent broadcasters themselves. As we explain next in the first part of our O'Brien analysis, we find that both interests are materially advanced by the carry one, carry all rule. We will now address each interest in turn.
 
 1.
 
 39
 Congress enacted the carry one, carry all rule to "preserve free television for those not served by satellite or cable systems and to promote widespread dissemination of information from a multiplicity of sources." SHVIA Conf. Rep. at 101. These interests are clearly substantial and unrelated to the suppression of free expression. See Turner I, 512 U.S. at 662-63 (stating that the government's interests in "preserving the benefits of free, over-the-air local broadcast television" and "promoting the widespread dissemination of information from a multiplicity of sources" were both important and unrelated to the suppression of free expression). In deciding whether S 338 materially advances these two interests, it is useful to characterize them more precisely. We therefore adopt the characterization suggested in Turner II, where the Supreme Court treated the two interests as a unified whole: "Congress has an independent interest in preserving a multiplicity of broadcasters to ensure that all households have access to information and entertainment on an equal footing with those who subscribe to cable." Turner II, 520 U.S. at 194; see also id. at 193, 117 S. Ct. 1174 (stating that Congress's interest in "preserving the existing structure of the broadcast industry discloses a purpose to prevent any significant reduction in the multiplicity of broadcast programming sources available to noncable households" (internal quotation marks and citation omitted)); id. at 226, 117 S. Ct. 1174 (Breyer, J., concurring in part) (describing the Cable Act's purpose as "provid[ing] over-the-air viewers who lack cable with a rich mix of over-the-air programming" and "assur[ing] the over-the-air public access to a multiplicity of information sources" (internal quotation marks and citation omitted)). In short, the government interests served by the carry one, carry all rule are best characterized as a single interest in preserving a multiplicity of broadcast outlets for over-the-air viewers.
 
 
 40
 This characterization accurately captures the concerns expressed by Congress when it enacted S 338. In explaining that a market-by-market license promotes both the interest in preserving broadcast television for over-the-air viewers and the interest in promoting widespread dissemination of information from multiple sources, Congress expressed its concern that "absent must-carry obligations, satellite carriers would carry the major network affiliates and few other signals. Non-carried stations would face the same loss of viewership Congress previously found with respect to cable noncarriage." SHVIA Conf. Rep. at 101. In other words, Congress understood that the threat to over-the-air viewers was not the loss of broadcasting as a medium, but the loss of the independent stations needed to provide those viewers with a rich mix of broadcast programming from multiple sources.
 
 
 41
 The proper question, then, is whether the government's interest in preserving a multiplicity of broadcast outlets for over-the-air viewers is materially advanced by the carry one, carry all rule. The satellite carriers appear to concede that the rule would effectively combat any real threat to this interest, but the carriers argue that they do not pose a real threat. Congress, however, concluded that satellite carriers would threaten this interest in the near future if it gave them a statutory copyright license without imposing carriage rules. See SHVIA Conf. Rep. at 101. Our review of that judgment has both factual and legal aspects. We must decide whether Congress's factual predictions about the consequences of enacting a station-by-station copyright license were supported by substantial evidence in the legislative record. See Turner II, 520 U.S. at 195-96. We may also look to evidence outside the legislative record in order to confirm the reasonableness of Congress's predictions. See id. at 196, 204, 117 S. Ct. 1174. In addition, we must determine whether the predicted set of consequences is legally sufficient to count as a real threat to the government's interest in preserving a multiplicity of broadcast outlets for over-the-air viewers.
 
 
 42
 Congress made extensive statutory findings in enacting the Cable Act. See Cable Act S 2(a), 106 Stat. at 1460-63. SHVIA's legislative record is less extensive, but this does not affect our duty to accord substantial deference to Congress's predictive judgments. "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." Turner I, 512 U.S. at 666; see also Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 133 (1989) (Scalia, J., concurring) ("Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote."). We can fairly conclude from the legislative record that Congress made the following three factual predictions: (1) that satellite carriers would soon capture a significant part of the television programming delivery market, (2) that satellite carriers would continue to deny carriage to significant numbers of independent stations in markets where they chose to offer local-into-local service, and (3) that non-carried stations in those markets would be harmed by losing access to parts of their potential audiences. In sum, Congress predicted that if satellite carriers enjoyed a statutory copyright license but were not bound by carriage rules, significant numbers of independent broadcast stations would be harmed by losing access to significant portions of their audiences. As we explain below, each of Congress's predictions was supported by substantial evidence. The harder question is the essentially legal one of whether the consequences Congress predicted constitute a real threat to the government's interest in preserving a multiplicity of local broadcast outlets for over-the air viewers. We begin with the three factual predictions, addressing them one by one.
 
 
 43
 Congress's prediction that satellite carriers would become a significant force in the television programming delivery market was supported by substantial evidence. While Congress did not explicitly find that satellite carriers would attain any specific level of market penetration, it obviously projected that satellite carriers would attract enough viewers to put downward pressure on cable rates. Congress created the S 122 copyright license to produce this result, see SHVIA Conf. Rep. at 91-92; S. Rep. No. 106-51, at 1-3 (1999), and it cannot be unreasonable for Congress to proceed on the premise that its own legislation will be effective. Moreover, the rapid growth in satellite service since SHVIA's enactment suggests that Congress's prediction will soon come true. The number of DBS subscribers grew by 28 percent between June 1999 and June 2000. See FCC Seventh Annual Report at P 61. In comparison, cable subscriptions grew at an annual rate of less than 1.5 percent. See id. at P 65. DBS providers have attributed much of their growth to the S 122 license. See id. at P 68; see also id. at P 69 (stating that SBCA reported a 43 percent increase in the number of new DBS subscribers per month in the 6 months following SHVIA's enactment). In its comments for the FCC's Seventh Annual Report, SBCA predicted that DBS service might have as many as 16 million subscribers (over 15 percent of American television households) by the end of 2000.[7]
 
 
 44
 See id. at P 65. In sum, Congress's first prediction was entirely reasonable.
 
 
 45
 Congress's second prediction was that without S 338, satellite carriers would refuse to carry significant numbers of independent broadcast stations in markets where they offered localinto-local service. See SHVIA Conf. Rep. at 101. This prediction was supported by substantial evidence in the record before Congress. See, e.g., 1999 Senate Hearing at 10 (statement of Charles Ergen). In addition, the satellite industry's track record under SHVIA has proven the prediction to be accurate. As of November 5, 2001, DirecTV carried the four major network affiliates in 41 markets (a total of 164 stations), but carried a total of only 13 independent stations in those 41 markets. See www.skyreport.com/skyreport/local.htm. Similarly, EchoStar carried the four major network affiliates in 35 markets (a total of 140 stations), but carried only 13 independent stations in those markets. See id. Thus, during SHVIA's phase-in period the satellite carriers have confined their local-into-local offerings almost exclusively to major network affiliates. Moreover, they have plainly announced their intention to continue cherry picking the major network affiliates so long as they may lawfully do so. This preference for cherry picking will not simply wither away because it is rooted in the national character of existing satellite technology.
 
 
 46
 As we have said, satellite carriers currently beam the same signals throughout the nation from satellites orbiting in full CONUS slots. As a result, a carrier who chooses to retransmit the signal of an independent commercial station in Boston beams that station's signal to subscribers nationwide, but blocks out the signal at the homes of all subscribers who do not live in the Boston area. As this example illustrates, local-into-local service is a relatively inefficient use of a carrier's finite channel capacity. National programming uses that capacity more efficiently because it can be expected to draw more viewers across the country as a whole than any local channel, even if the national programming is less popular within individual local markets than the programming of the independent broadcast stations in those markets. As a result, satellite carriers have economic incentives to favor national non-broadcast programming over local broadcast programming. While improvements in satellite technology, such as the deployment of spot beam satellites, may reduce the inefficiencies that result from carrying local broadcast stations, these inefficiencies will continue to exist to some degree so long as the beams from individual satellites cover multiple television markets. Yet satellite carriers also recognize that their product is less attractive to subscribers if they fail to carry the local affiliates of major networks because most people watch these stations about "65 percent of the time" they spend watching television. 1999 Senate Hearing at 7 (statement of Charles Ergen). Under these circumstances, the economically rational choice for satellite carriers is to cherry pick the major network affiliates in markets where the carriers offer local-into-local service. We conclude, then, that both the satellite industry's track record and its economic incentives provide substantial evidence supporting Congress's predictive judgment that satellite carriers will deny carriage to significant numbers of independent broadcast stations if the carriers are not bound by the carry one, carry all rule.
 
 
 47
 Congress's third prediction was that lack of satellite carriage would harm independent broadcast stations. See SHVIA Conf. Rep. at 101 (stating that "[n]on-carried stations would face the same loss of viewership Congress previously found with respect to cable noncarriage"). This general prediction rested on the following series of more specific predictions about the consequences of non-carriage. First, a non-carried station will effectively lose access to satellite subscribers if satellite carriers cherry pick the major network affiliates in its market.[8] Second, a station's loss of access to those subscribers will result in lower ratings, which will in turn lead to lower advertising revenues. Third, lower revenues will lead to a decrease in programming quality, which will then further depress ratings and station revenues, all in a vicious cycle. The record before Congress contains substantial evidence to support these predictions. See ante at 19 (statement of James J. Popham); Copyright Compulsory License Improvement Act: Hearings on H.R. 768 Before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 106th Cong. 47 (1999) (statement of John Hutchinson, CEO, Local Television on Satellite) (stating that "[s]atellite could effectively, like cable, become the bottleneck which disenfranchises stations"). Further, the predictions are essentially the same as those Congress made in passing the Cable Act. See Turner II, 520 U.S. at 208-09 (discussing testimony from broadcasters that explained how cable non-carriage leads to declines in ratings, advertising revenues, and program quality). As the Supreme Court explained in Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 391 (2000), the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." Because the justifications here were both familiar and plausible, Congress could reasonably conclude, at the very least, that noncarried stations would suffer some degree of harm in the absence of the carry one, carry all rule. The extent of that harm would depend, of course, on how many potential viewers of non-carried stations became satellite subscribers.
 
 
 48
 So far, we have established that Congress had substantial evidence to support its overall prediction that in a world where satellite carriers enjoyed the benefits of a statutory copyright license without the burdens of the carry one, carry all rule, satellite carriers would become significant competitors to cable and would continue to cherry pick major network affiliates in markets where they offered local-into-local service. In that world, non-carried stations in cherry-picked markets would lose access to significant parts of their local audiences. Again, the harder question is whether this predicted set of consequences is enough to justify imposing the carry one, carry all rule on satellite carriers in order to protect the government's interest in preserving a multiplicity of broadcast outlets for over-the-air viewers. In other words, the question is whether preventing the consequences Congress predicted counts as addressing a real threat to that interest in a material way.
 
 
 49
 This is essentially a legal question, and the satellite carriers claim that it has a clear answer. Relying on Turner II, they argue that imposing carriage rules on a particular television programming delivery medium is justified only when stations not carried by that medium will "deteriorate to a substantial degree or fail altogether." Turner II, 520 U.S. at 208. It is only at this point, they claim, that carriage denials affect the interests of over-the-air viewers. The satellite carriers contend that under Turner II's substantial deterioration standard, the carry one, carry all rule does not address a real threat because Congress lacked substantial evidence to support the judgment that stations denied access to (at most) 15 percent of their audiences would substantially deteriorate. The carriers remind us that when Congress enacted the Cable Act in 1992, cable controlled 60 percent of the television programming delivery market. See Cable Act S 2(a)(3), 106 Stat. at 1460.
 
 
 50
 To the extent that the satellite carriers would have us decide this case by looking at the difference between the 13 to 15 percent market share of satellite carriers today and the 60 percent market share enjoyed by cable in 1992, they oversimplify the issues. For one thing, Turner II held only that Congress could reasonably conclude that a broadcast station's loss of access to 60 percent of its market was sufficient to cause that station to substantially deteriorate. It left open the possibility that Congress could reasonably conclude that some smaller level of audience loss would significantly harm non-carried stations. More fundamentally, however, we reject the satellite carriers' argument that substantial deterioration of non-carried broadcast stations is always the proper standard for deciding when carriage rules are justified. The substantial deterioration standard does not work here because that standard was formulated to address a situation where the market for subscription television services was dominated by a single medium.
 
 
 51
 When Congress passed the Cable Act of 1992, cable television was the sole threat to the government's interest in preserving a multiplicity of broadcast outlets for over-the-air viewers. The substantial deterioration standard employed in Turner II assumes the existence of a unitary threat by insisting that the government show that denial of carriage on an individual medium would threaten the viability of independent broadcasters. See Turner II, 520 U.S. at 195. But the substantial deterioration standard was not meant to address situations in which the threat to broadcasters comes from competitors in multiple mediums, and it yields implausible results when applied outside its intended context. Suppose, for example, that five different television delivery mediums each served 15 percent of television households, together serving 75 percent of those households. If the standard applied in these circumstances, it would mean that Congress could not impose must-carry rules on any of the mediums because stations denied carriage on any one medium would lose access to only 15 percent of their audiences and therefore would not suffer substantial deterioration. That cannot be the law.
 
 
 52
 In enacting SHVIA, Congress properly considered the effects of satellite and cable together in deciding to protect over-the-air viewers from any significant reduction in their viewing options. Cable and satellite together currently serve around 80 percent of America's television households, with cable accounting for about 65 percent and satellite about 15 percent. We have already explained that both services pose the same kind of threat to broadcast stations because both -by making selective carriage decisions -threaten to cut off independent broadcast stations from parts of their audiences. Together, cable and satellite would pose an overwhelming threat to independent broadcasters if neither were bound by carriage rules. Congress evidently reasoned that with increasing competition from satellite carriers, the threat to independent broadcasters posed by cable would become a threat jointly posed by cable and satellite. It therefore concluded that it could regulate both contributors to that common threat: "The [Conference Committee] expect[s] that, by January 1, 2002, satellite carriers' market share will have increased and that the Congress'[s] interest in maintaining free over-the-air television will be undermined if local broadcasters are prevented from reaching their viewers by either cable or satellite distribution systems." SHVIA Conf. Rep. at 101 (emphasis added).
 
 
 53
 The satellite carriers contend that the carry one, carry all rule needlessly restricts their speech because it is not necessary to protect the interests of over-the-air viewers. Again, they claim that those interests are not threatened because broadcasters denied satellite carriage will not lose access to enough of their audiences to suffer substantial deterioration. But if over-the-air viewers are currently safe, that only reflects the fact that cable is already bound by must-carry rules. In other words, the satellite carriers' arguments boil down to the claim that even if both cable and satellite jointly contribute to a common threat to the government's interest in protecting a multiplicity of broadcast outlets for over-the-air viewers, Congress may not impose carriage rules on satellite carriers because their contribution to that common threat is smaller and because cable is already regulated. The First Amendment does not require this result. It is more sensible to allow Congress the latitude to view the regulatory landscape as a whole by considering the cumulative effects of cable and satellite without making fine distinctions regarding their relative contributions in creating those effects. Where multiple competitors jointly pose a common threat with a common structure, the First Amendment permits Congress to protect important government interests from that threat by imposing reasonable content-neutral restrictions on every competitor who significantly contributes to that threat.
 
 
 54
 Under this standard, Congress's factual predictions easily justify the imposition of the carry one, carry all rule. Even if it is debatable whether satellite's current market share is sufficient to count as a significant contribution to the common threat posed by cable and satellite, Congress surely had a substantial basis for concluding that satellite would soon become a significant challenger to cable in the television programming delivery market. Accordingly, we hold that Congress reasonably concluded that the carry one, carry all rule addressed a real threat to the government's interest in preserving a multiplicity of broadcast outlets for over-the-air viewers. That interest therefore survives the first part of the O'Brien inquiry: it is substantial, and it is genuinely advanced by the carry one, carry all rule.
 
 2.
 
 55
 The FCC argues that the carry one, carry all rule also materially advances a second substantial government interest: the interest in preventing SHVIA's grant of a statutory copyright license to satellite carriers from undermining competition in local markets for broadcast television advertising. This interest is, as we have said, closely related to the interest in preserving a multiplicity of broadcast stations for over-the-air viewers. Both interests are threatened when independent broadcasters lose access to parts of their local audiences as a result of cherry picking by satellite carriers. But although cherry picking threatens both interests in the same way, the interests are nonetheless distinct. The first interest is ultimately an interest in protecting overthe-air television viewers. The second is an interest in protecting the broadcasters themselves, as well as the advertisers who benefit from vigorous competition among the broadcast stations in their local markets.
 
 
 56
 The satellite carriers attempt to portray the carry one, carry all rule as a self-conscious government attempt to manipulate a previously undistorted marketplace of ideas in order to prop up weak broadcast stations. This portrayal misrepresents the realities of the television market. When Congress considered SHVIA in 1999, that market was already pervasively shaped by government policies: FCC licensing of broadcasters, the cable must-carry rules, copyright law, and the statutory licenses enjoyed by cable and (to a lesser extent) satellite are only a few examples. Against that backdrop Congress explicitly sought ways to improve the competitive position of satellite in relation to cable because it believed that cable rates were too high. Nothing in the text of SHVIA or its legislative history indicates that Congress thought broadcasters enjoyed any unfair advantages in relation to satellite or cable. Recognizing that satellite carriers needed a statutory copyright license to be able to compete with cable, Congress then considered the possible effects on independent broadcasters of the decision to grant that license.
 
 
 57
 As we have explained above, the choice was between offering satellite carriers a station-by-station license and a market-by-market license. Congress understood that allowing satellite carriers to offer local-into-local service by cherry picking network affiliates would deprive non-carried stations of access to significant (and growing) parts of their audiences. We have already discussed at length the possibility that cherry picking would ultimately harm over-the-air viewers by reducing the quality or quantity of broadcast outlets available for those viewers, but here we are concerned with the immediate effects of selective carriage on local television advertising markets. Local broadcasters and cable companies compete with one another in those markets, and their competitive positions are a function of their ratings. Independent stations that lost access to even a small part of their potential audiences would therefore be placed at a competitive disadvantage compared to carried stations in their efforts to attract local advertisers. See 1998 House Hearing at 68 n.38 (statement of James J. Popham). Congress heard testimony that a station-by-station license would essentially enable satellite carriers to pick winners and losers in local advertising markets, undermining the efforts of emerging television networks to compete with the established broadcast networks: "Nothing could more surely dull the cutting edge of competition from new networks, their local affiliates, and innovative independent stations in local markets." Id. at 59. In short, Congress had substantial evidence for the judgment that a station-by-station license copyright license would have boosted competition in one market (the market for subscription television services) by hampering competition in another market (the market for local broadcast advertising). Such a license would have harmed both independent broadcasters and local advertisers. By choosing a market-by-market license, Congress acted to minimize the unintended, disruptive effects of its intervention in the television marketplace.
 
 
 58
 This interest in preserving a level playing field in local broadcast advertising markets seems to us at least as significant as many interests which the Supreme Court has found to be important or substantial. See, e.g., Clark v. Community for Creative Non-Violence, 468 U.S. 288, 296 (1984) (holding that government had a substantial interest in maintaining parks in Washington, D.C., in "an attractive and intact condition"); Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 807 (1984) (holding that city had a substantial interest in preventing "the visual assault on the citizens of Los Angeles presented by an accumulation of signs posted on public property"). We therefore conclude that Congress's interest in minimizing the unintended adverse effects of its legislation on local broadcast advertising markets is substantial enough to justify incidental, contentneutral restrictions on speech. The carry one, carry all rule advances this interest in a material way because it preserves a level playing field on which local broadcasters can compete for advertising revenue by preventing satellite carriers from making selective carriage decisions within local television markets. Accordingly, we hold that this interest also satisfies the first part of the O'Brien analysis.
 
 3.
 
 59
 We have identified two interests that pass scrutiny under the first part of the O'Brien analysis. The second part of the O'Brien analysis employed in Turner II requires us to ask whether the carry one, carry all rule is a narrowly tailored means of advancing these interests. The government has considerable latitude under this test. It may "employ the means of its choosing so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further that interest." Turner II, 520 U.S. at 213-14 (internal quotation marks and citation omitted). The parties have devoted relatively little attention to this aspect of the O'Brien analysis, and with good reason. Congress enacted the carry one, carry all rule to protect independent broadcast stations from the harm they would suffer if satellite carriers denied them carriage while retransmitting the signals of the major network affiliates in their markets. As we have explained, the rule genuinely advances two important interests: the interest in preserving a multiplicity of local broadcast outlets for those who do not subscribe to cable or satellite and the interest in minimizing the unintended effects of SHVIA's statutory copyright license on local broadcast advertising markets. The satellite carriers concede that without the carry one, carry all rule, they would have chosen to carry only major network affiliates in many local markets and would therefore have threatened independent broadcasters with the very harms that Congress sought to prevent. Accordingly, any legislation that created a statutory copyright license without imposing some form of mandatory carriage requirement would have been significantly less effective -indeed, it would have been completely ineffective -in advancing the government's interests. That is sufficient to satisfy O'Brien's narrow tailoring requirement. Further, the particular form of carriage requirement imposed by SHVIA is not an excessive burden on satellite carriers because it leaves them with the choice of when and where they will become subject to the carry one, carry all rule. As a result, we hold that the rule is a narrowly tailored means of promoting the government's important ends of preserving a vibrant mix of local broadcast outlets for over-the-air viewers and minimizing the unintended side effects of SHVIA's statutory copyright license on local broadcast advertising markets. The carry one, carry all rule is therefore consistent with the First Amendment.
 
 C.
 
 60
 We have reserved for separate consideration the satellite carriers' argument that the carry one, carry all rule cannot be justified under the reasoning of the Turner cases because Congress had no evidence that the rule was needed to prevent anticompetitive behavior by satellite carriers. The satellite carriers claim that the cable must-carry rules were designed to prevent anticompetitive behavior by cable operators and that the Supreme Court upheld those rules only by virtue of their relationship to that goal.
 
 
 61
 The satellite carriers are correct that Congress was concerned about anticompetitive practices when it passed the Cable Act. Congress had substantial evidence that cable operators had bottleneck monopoly power over their subscribers' access to television signals and that cable operators had substantial economic incentives to abuse that power by denying carriage to local broadcast stations even when those stations were more popular with cable subscribers than some of the cable channels that replaced them. Congress found that the cable industry competed with local broadcasters for advertising revenues and that cable therefore had incentives to reduce the attractiveness of broadcast stations to advertisers by refusing to carry those stations. See Cable Act S 2(a)(14)-(15), 106 Stat. at 1462. Congress also found that vertical integration in the cable industry (common ownership of cable systems and cable programming sources) gave cable operators reasons to favor cable programming over broadcast programming. See id. S 2(a)(5), 106 Stat. at 1460. Congress lacked similar evidence of anticompetitive behavior by satellite carriers. While satellite carriers also possess bottleneck power in the sense that they control the primary gateway through which television programming enters the homes of their subscribers, Congress had no evidence that satellite carriers would abuse that power by engaging in anticompetitive behavior. Unlike cable companies, satellite carriers do not compete with local broadcasters for advertising and they are not vertically integrated with non-broadcast programming sources to any significant degree.
 
 
 62
 The satellite carriers argue that without evidence of unfair competition by satellite carriers, the carry one, carry all rule must be struck down. The argument cannot be summarily rejected, for it is not immediately clear whether or how the holdings in the Turner cases depend on evidence of anticompetitive practices in the cable industry. Compare Turner I, 512 at 661 (stating that the must-carry rules are "justified by special characteristics of the cable medium: the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television") with Turner II, 520 U.S. at 226 (Breyer, J., concurring in part) (providing the fifth vote to uphold the must-carry rules without relying on the claim that the rules "sensibly compensate for some significant market defect"). As we read the Turner opinions, however, the theme of preserving broadcast television is more fundamental than the theme of preventing unfair competition: "Federal policy . . . has long favored preserving a multiplicity of broadcast outlets regardless of whether the conduct that threatens it is motivated by anticompetitive animus or rises to the level of an antitrust violation. . . . Congress has an independent interest in preserving a multiplicity of broadcasters to ensure that all households have access to information and entertainment on an equal footing with those who subscribe to cable." Turner II, 520 U.S. at 194 (emphasis added). This means that if satellite carriers threaten the government's interest in preserving a multiplicity of local broadcast outlets, it does not matter whether the threat can be traced to anticompetitive practices by those carriers. Our reading gains further support from the fact that in Turner II the Court discussed evidence of unfair competition primarily to establish that cable operators would in fact deny carriage to substantial numbers of broadcast stations without the must-carry rules. See id. at 197-208, 117 S. Ct. 1174. In other words, the discussion of anticompetitive behavior in Turner II sought not to explain the nature of the interest promoted by the must-carry rules, but to explain why the threat that cable posed to broadcast television and its viewers was real rather than conjectural.
 
 
 63
 Satellite carriers do not deny carriage to independent broadcasters for anticompetitive reasons. As we have explained, they do so because the national character of satellite delivery systems provides economic incentives to favor national, nonbroadcast programming over local, broadcast programming. There is nothing anticompetitive about satellite carriers' efforts to make the most efficient use of their existing channel capacity. In contrast, Congress found that in the absence of must-carry, cable operators would likely deny carriage to many independent broadcast stations for anticompetitive reasons, such as the desire to undercut a competitor in the market for local advertising. The crucial point here, however, is that this difference between satellite carriers and cable operators does not change the analysis under the Turner cases in any fundamental way. Cherry picking major network affiliates in a local market threatens the noncarried broadcast stations in that market (and, ultimately, the viewers who depend on them) in the same ways, regardless of whether the motive behind the cherry picking is anticompetitive or not. Accordingly, we reject the satellite carriers' argument that the carry one, carry all rule could only be justified as a means to prevent anticompetitive behavior by satellite carriers.
 
 D.
 
 64
 In conclusion, we hold that the carry one, carry all rule is a reasonable, content-neutral restriction on satellite carriers' speech. It satisfies the O'Brien standard because it is narrowly tailored to serve two substantial government interests: the interest in preserving a multiplicity of broadcast outlets for over-the-air viewers and the interest in preventing SHVIA's statutory copyright license from undermining competition in local broadcast advertising markets. The rule's relation to either interest is sufficient to render it consistent with the First Amendment.
 
 III.
 
 65
 The satellite carriers devote limited attention to their remaining constitutional arguments. They contend that Congress exceeded its power under the Copyright Clause when it conditioned satellite carriers' rights to make use of SHVIA's statutory copyright license upon their compliance with the carry one, carry all rule. The carriers also argue that the rule constitutes an uncompensated taking of their property in violation of the Fifth Amendment. The district court correctly rejected both claims[9]
 
 
 66
 The Copyright Clause gives Congress the power to "promote the Progress of Science . . . by securing for limited times to Authors . . . the exclusive right to their writings." U.S. Const. art. I, S 8, cl. 8.[10] The Copyright Clause, the satellite carriers point out, was meant to promote the public welfare by encouraging creative work. The carriers contend that SHVIA exceeds Congress's authority under the Copyright Clause because the statute plays favorites by using the copyright power to protect the speech of independent local broadcasters. The Copyright Clause does place some limits on congressional power. For example, the clause does not permit Congress to grant permanent copyright protection to an author. Nevertheless, as the Supreme Court has recognized, Congress's powers under the clause to grant copyright protection and to define the scope of that protection are very broad: "As the text of the Constitution makes plain, it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . . [T]his task involves a difficult balance between the interests of authors . . . in the control and exploitation of their writings . . . on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984). The copyright power certainly includes the authority to grant statutory copyright licenses like those created by SHVIA and the Cable Act. These statutory licenses are designed to ensure that the high transaction costs involved in privately acquiring copyright clearances for the retransmission of broadcast programming do not unduly restrict the free flow of information to the public. See U.S. Copyright Office, A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals, at 32 (1997). We see no reason why the Copyright Clause would prohibit Congress from conditioning its grant of a statutory copyright license on compliance with the carry one, carry all rule. That rule protects independent broadcasters against the loss of viewership that would result if satellite carriers were allowed to cherry pick the major network affiliates in those stations' local markets. The rule thereby serves to prevent the statutory copyright license from being used to undermine the government's interest in ensuring that over-the-air viewers continue to receive a rich mix of information and programming from a multiplicity of local broadcast sources. In other words, Congress structured SHVIA's statutory copyright license in a way that will ensure the free flow of ideas and information to over-the-air viewers. In doing this, Congress was simply performing its constitutionally assigned task of striking a balance between the interests of authors and the public interest. Accordingly, we hold that Congress acted within its power under the Copyright Clause when it imposed the carry one, carry all rule.
 
 
 67
 The satellite carriers also argue that the carry one, carry all rule violates the Takings Clause. They claim that the rule works a per se taking under Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), because it limits their right to exclude the unwanted signals of local television stations from their property. The argument fails because the Supreme Court has made clear that a per se taking under Loretto must involve "required acquiescence" in a permanent physical occupation of property. See FCC v. Florida Power Corp., 480 U.S. 245, 251-53 (1987) (holding that Pole Attachments Act does not effect a per se taking because it does not require utility companies to provide space on their utility poles to cable companies). Here, the statute does not require the satellite carriers to do anything. It merely places conditions on their use of a benefit (the statutory license) the government need not have conferred. This cannot be an unconstitutional taking of the satellite carriers' property.
 
 IV.
 
 68
 Certain broadcast representatives, in their petition for review, challenge one aspect of the FCC's SHVIA Order as "arbitrary, capricious . . . or otherwise not in accordance with law" under the Administrative Procedure Act. 5 U.S.C. S 706(2)(A). In paragraph 99 of the order the FCC considered the implementation of 47 U.S.C. S 338(d), which requires satellite carriers offering local-into-local service to "provide access to [a local television] station's signals at a nondiscriminatory price and in a nondiscriminatory manner." Broadcasters argued to the FCC that the statute requires satellite carriers to offer all broadcast stations in a local market as part of one viewing package, but the FCC rejected that argument as follows:
 
 
 69
 [S]ection 338's anti-discrimination language prohibits satellite carriers from implementing pricing schemes that effectively deter subscribers from purchasing some, but not all, local television signals. Thus, we find that a satellite carrier must offer local television signals, as a package or a la carte, at comparable rates.
 
 
 70
 SHVIA Order at P 99.
 
 
 71
 It is this a la carte rule that the broadcasters challenge. As originally issued, the a la carte rule would apparently have allowed satellite carriers a great deal of flexibility in packaging local stations for their subscribers. For example, the rule might have allowed satellite carriers to offer a package of the four major network affiliates in a local market while offering any additional stations on an a la carte basis. This option was of particular concern to broadcasters, who argued that allowing stations to be packaged in this manner would effectively deter many satellite subscribers from purchasing the signals of independent broadcast stations. During the pendency of this appeal, however, the FCC issued a Reconsideration Order which clarifies the a la carte rule adopted in paragraph 99 of the original SHVIA Order. The FCC has now declared that allowing satellite carriers to offer some stations (for example, major network affiliates) as a package while offering other local stations on an a la carte basis would violate the nondiscrimination requirement in S 338(d). See Reconsideration Order at P 48. The a la carte rule, as clarified in the Reconsideration Order, allows satellite carriers to give their subscribers two basic choices: subscribers may buy all local stations as one package, or they may buy the individual stations on an a la carte basis. As any objections to the FCC's original a la carte rule are now moot, we need only consider whether this newly clarified two-option a la carte rule can survive the broadcasters' challenge.
 
 
 72
 We must first consider the FCC's argument that the broadcasters' attack on the a la carte rule is not ripe for review. Ripeness determinations depend on both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983). Here, the rule is a final agency action, and the FCC has no interest in further "crystallizing its policy before that policy is subject to review." Reg'l Mgmt. Corp. v. Legal Servs. Corp., 186 F.3d 457, 465 (4th Cir. 1999) (internal quotations marks and citation omitted). Moreover, the broadcasters' challenge is fit for decision because it raises purely legal questions: whether the a la carte rule is an unreasonable interpretation of S 338(d), and whether the FCC has articulated a reasonable explanation for its action in adopting the rule. See Pacific Gas, 461 U.S. at 201 (stating that "predominantly legal" issues are fit for decision even when further factual development would be helpful). In addition, any hardship considerations weigh in favor of deciding the questions now because the broadcasters have an interest in knowing which packaging options for local broadcast stations will be available to satellite subscribers when the carry one, carry all rule takes effect. We therefore hold that the legal challenge raised by the broadcasters is ripe for review.
 
 
 73
 The broadcasters first claim that the a la carte rule is not in accordance with law under 5 U.S.C. S 706(2)(A) because the FCC unreasonably interpreted the nondiscrimination requirement in S 338(d) of SHVIA. We review this claim under the well-known standards articulated by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Under Chevron we first ask "whether Congress has directly spoken to the precise question at issue." Id. at 842, 104 S. Ct. 2778. Here, we ask if Congress explicitly decided whether satellite carriers should be required to offer local stations to their subscribers in only one configuration, specifically, a single package including all of the stations in a given television market. If we can discern Congress's intent on this issue by using "traditional tools of statutory construction," id. at 843 n.9, 104 S. Ct. 2778, we must give effect to that intent. If, however, the statute is "silent or ambiguous" about the issue, we must defer to the agency's reasonable construction of the statute. Id. at 843-44, 104 S. Ct. 2778.
 
 
 74
 The broadcasters argue that if we consider the structure and purposes of SHVIA as a whole, we will see that Congress expressed its clear intent that satellite carriers be required to offer all local stations in a market as part of one package. The broadcasters claim that Congress sought to ensure that every local broadcast station could reach every household in its market. According to the broadcasters, this goal will be undermined if satellite subscribers are allowed to choose to subscribe to some local stations but not others. Broadcast stations not chosen by satellite customers, they suggest, will lose access to parts of their audiences just as surely as if they had been denied carriage by satellite carriers. The broadcasters explain that the a la carte rule will hurt the ratings of non-chosen stations because "[m]any people who might not choose to purchase an entire signal would nonetheless watch particular programs on that station if the signal reached their television set as it would over-the-air or through cable." Reply Brief for Petitioner NAB at 19.
 
 
 75
 The broadcasters fail to show that Congress clearly expressed the intent to require that all local stations be offered in a single package. As the FCC points out, Congress knew how to impose such a requirement. It did so explicitly in the Cable Act. See 47 U.S.C. S 543(b)(7)[11]. SHVIA says only that carriers must offer local stations at a "nondiscriminatory price and in a nondiscriminatory manner." Id. S 338(d). As the FCC also points out, "nondiscriminatory pricing" seems to contemplate the possibility that local stations will be offered separately. This is so because a carrier could not make discriminatory pricing decisions if all local stations had to be offered only as part of a single package. We conclude, therefore, that Congress has not clearly expressed its intentions on the issue of whether satellite carriers should be required to offer all local stations as part of a single package. Accordingly, we ask only whether the FCC's interpretation of the statute is reasonable. It easily meets that standard because, as we have just explained, the statutory language contemplates the possibility that stations will be offered to subscribers on an individual basis. We therefore reject the broadcasters' argument that the a la carte rule is contrary to the statute.
 
 
 76
 The broadcasters also argue that the a la carte rule is arbitrary and capricious under 5 U.S.C. S 706(2)(A). Although the scope of review under this standard is narrow, the agency is required to articulate a "satisfactory explanation for its action [that demonstrates] a rational connection between the facts found and the choice made." Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)(internal quotation marks and citation omitted). The broadcasters roundly criticize the FCC's reasoning in adopting the a la carte rule. We conclude, however, that the FCC's adoption of the a la carte rule was not an irrational response to the statute and the administrative record. Although the broadcasters claim that the a la carte rule harms local television stations and offers no corresponding benefits, the FCC has plausibly explained that the rule promotes consumer choice. See Reconsideration Order at P 46. In the end, the FCC's a la carte rule does little more than restate the statutory language of S 338(d). That language requires "nondiscriminatory prices," while the a la carte rule says that carriers may offer stations a la carte at "comparable rates." We therefore hold that the FCC's decision to adopt the a la carte rule was not arbitrary and capricious.
 
 V.
 
 77
 For the foregoing reasons, we hold that the carry one, carry all rule does not violate the Constitution and that the a la carte rule is not arbitrary and capricious or contrary to law. Accordingly, the order of the district court is affirmed, and the petitions for review of the FCC's SHVIA Order are denied.[12]
 
 
 78
 No. 01-1151: PETITION DENIED.
 
 
 79
 No. 01-1271: PETITION DENIED.
 
 
 80
 No. 01-1272: PETITION DENIED.
 
 
 81
 No. 01-1818: AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The parties in these cases fall into three groups, according to their interests regarding SHVIA: satellite industry representatives (or the "satellite carriers"), including the Satellite Broadcasting and Communications Association (SBCA), DirecTV, Inc., EchoStar Communications Corp., and Dish, Ltd., a wholly owned subsidiary of EchoStar doing business as DISH Network; broadcast representatives (or the "broadcasters"), including the National Association of Broadcasters (NAB), Paxson Communications Corp., and the Public Broadcasting Service (PBS); and the United States, essentially the Federal Communications Commission (FCC).
 
 
 [2]
 For ease of reference, we will often describe the class of broadcast stations that includes commercial independents, noncommercial stations, and emerging network affiliates as "independent" broadcast stations.
 
 
 [3]
 Our figures about the market shares of broadcast television, cable, and satellite are drawn from In the Matter of: Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Seventh Annual Report, CS Docket No. 00-132, 2001 WL 12938 (2001) (FCC Seventh Annual Report). The figures reflect industry data through June 2000. See id. at 106. The broadcasters contend that satellite service has grown significantly since June 2000 and that satellite market share now exceeds 15 percent of television households.
 
 
 [4]
 The obligations imposed by the carry one, carry all rule are more limited than the name implies. Satellite carriers are not required to carry local commercial stations whose signals substantially duplicate those of another station in the same market. 47 U.S.C. S 338(c)(1). In addition, satellite carriers are not required to carry more than one affiliate of a given network in any local market unless the market contains two affiliates of the same network that are licensed to serve communities in different states. Id. Finally, Congress instructed the FCC to issue regulations limiting satellite carriers' obligations to carry multiple noncommercial broadcast stations in the same market. Id. S 338(c)(2).
 
 
 [5]
 Congress, for example, heard testimony from satellite executives outlining plans to develop spot beam satellites, which will have a much smaller footprint (geographic area where the satellite's beam is received) than the satellites currently orbiting in full CONUS slots. See H.R. Rep. No. 106-79, pt. 1, at 14 (1999); Satellite/Cable Competition: An Examination of the EchoStar/MCI Deal. Hearing Before the Subcommittee on Antitrust, Business Rights, and Competition of the Senate Committee on the Judiciary, 106th Cong. 40-41 (1999) (1999 Senate Hearing) (statement of Charles Ergen, CEO of EchoStar). These satellites will permitcarriers to reuse their allotted spectrum frequencies in different geographic areas and will thereby increase the channel capacity carriers can use to offer local-into-local service. One reason why Congress decided to delay implementation of S 338 until January 1, 2002, was to give satellite carriers time to develop this new technology. See S. Rep. No. 106-51, at 14 (1999).
 
 
 [6]
 The FCC and the broadcasters argue that because S 338's carriage obligations are triggered by a satellite carrier's voluntary decision to make use of the S 122 license, the carry one, carry all rule does not impose a burden on speech at all and should therefore be subject only to rational basis review. They point out that SHVIA grants satellite carriers a valuable benefit (the statutory copyright license) and places conditions on the use of that benefit, but does not deprive the carriers of any rights they possessed before SHVIA was enacted. Accordingly, the FCC and the broadcasters contend that SHVIA's statutory copyright license should be seen as a targeted government subsidy by analogy to Rust v. Sullivan, 500 U.S. 173 (1991), and similar cases. As noted above, we find it unnecessary to address this argument because we conclude that the carry one, carry all rule is consistent with the First Amendment even if it is treated as a content-neutral burden on satellite carriers' speech.
 
 
 [7]
 As noted above, see supra note 3, the broadcasters contend that the market share of DBS providers now exceeds the 15 percent share forecast by SBCA in its comments for the FCC's Seventh Annual Report.
 
 
 [8]
 A non-carried station in a cherry-picked market loses access to satellite subscribers in that market in the sense that those subscribers will be significantly less likely to watch that station than would be the case if the subscribers received either all or none of their local stations via satellite. This proposition rests on two plausible and widely shared empirical assumptions. The first assumption is that television viewers prefer to receive all of their programming from one source. For subscribing households, satellite becomes the primary source of television programming, and it follows that satellite subscribers will be less likely to watch noncarried broadcast stations even if they have antennas that can capture a clear signal from those stations. The second assumption is that satellite subscribers who are able to receive local network signals via satellite will be unlikely to obtain or maintain antennas in order to receive independent local broadcast stations. See SHVIA Conf. Rep. at 102. In contrast, satellite subscribers who receive no network signals via satellite will probably use antennas or subscribe to basic cable in order to have access to network signals. This assumption explains why the carry one, carry all rule benefits independent broadcast stations even in markets where satellite carriers do not offer local-into-local service.
 
 
 [9]
 The satellite carriers also raised a substantive due process claim against the carry one, carry all rule in the district court, but only mention that claim in one short footnote in their brief to us. We reject this claim on the reasoning of the district court. See Satellite Broad. & Communications Ass'n of Am. v. FCC, 146 F.Supp.2d 803, 832-33 (E.D.Va. 2001).
 
 
 [10]
 In the language of the day, "science" included works of authorship. See Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1564 n.4 (Fed. Cir. 1988).
 
 
 [11]
 We recognize that the basic tier requirements imposed on cable operators by 47 U.S.C. S 543(b) are far more extensive than the rule the broadcasters would have the FCC impose on satellite carriers. Nevertheless, the basic tier rules show that Congress is quite capable of clearly dictating the manner in which local stations must be packaged. It failed to do this in S 338(d).
 
 
 [12]
 The satellite carriers have moved for an injunction against implementation of the carry one, carry all rule "pending final disposition of these cases by the Supreme Court of the United States." The motion is denied.